UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
KIM VASQUEZ,

                                   Plaintiff,

        - against -                                              **OPINION & ORDER**

POLICE OFFICERS MICHAEL WARREN,                                  No. 20-CV-5851 (CS)
THOMAS MURRAY, A. ESPOSITO & P. VAN
CURA (ALL IN THEIR INDIVIDUAL
CAPACITIES), SERGEANT N. WHALEN, #212,
and OFFICER PATRICK CASEY #247,

                                   Defendants.
----------------------------------------------------------------x

Appearances:

Kim Vasquez
Chester, New York
*Pro Se Plaintiff*

Paul Edward Svensson
Hodges Walsh & Burke, LLP
White Plains, New York
*Counsel for Defendants Warren, Murray, Whalen and Casey*

Leo Dorfman
Sokoloff Stern LLP
Carle Place, New York
*Counsel for Defendants Esposito and Van Cura*

Seibel, J.

        Before the Court is the motion for summary judgment of Defendants Michael Warren,

Thomas Murray, N. Whalen, and Patrick Casey (the "Orangetown Defendants") and the motion

for summary judgment of Defendants Andrew Esposito and Patrick Van Cura (the "South Nyack

Defendants").  (ECF Nos. 141, 162.)  For the following reasons, Defendants' motions are

GRANTED.

# I.    BACKGROUND

## A.    Facts

The following facts are based on Orangetown Defendants' and South Nyack Defendants'

Local Civil Rule 56.1 Statements and supporting materials, and are undisputed unless otherwise

noted.[1]

On February 20, 2020, around 4:40 pm, South Nyack-Grand View and Orangetown

police officers were dispatched to the Pavion Apartments ("Pavion") located at 66 Cedar Hill

Avenue in Nyack, New York.  (ECF No. 142-4 Exs. D & D1; ECF No. 142-5; ECF No. 142-6;

ECF No. 145 ("South Nyack Ds' 56.1") ¶¶ 1, 6).  Prior to dispatch, Pavion employee Stephanie

Hesington called the Orangetown Police Department ("OPD") to report an "irate" man who was

"trying to put his hands on myself and my boss."  (South Nyack Ds' 56.1 ¶ 6.)  During the 911

---

[1] Plaintiff did not file any responsive Rule 56.1 Statement.  Local Civil Rule 56.1 requires that the party opposing a motion for summary judgment submit a counterstatement responding to the moving party's statement of material facts, indicating which facts are admitted and which the opposing party contends are in dispute and require a trial.  L.R. 56.1(b).  Under the Local Rule, "[i]f the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."  *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) (citing L.R. 56.1(c)).  *Pro se* litigants are not excused from this requirement.  *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 344 n.4 (S.D.N.Y. 2011).  The South Nyack Defendants represent that they served Plaintiff with a document entitled "Pro Se Litigant and FRCP 56," by which I assume they mean the notice required by Local Civil Rule 56.2, although they did not docket the notice.  (ECF No. 148.)  The Orangetown Defendants also served the required 56.2 notice on Plaintiff.  (ECF No. 150-31; ECF No. 163 ¶ 37.)  Further, at a conference on November 15, 2021, I explained to Plaintiff – who has been a plaintiff in 22 cases in this Court – that he would be required to respond, entry by entry, to Defendants' statements and to provide evidence supporting his positions.  Plaintiff failed to do so, and I could have regarded Defendants' version as entirely undisputed, but granting Plaintiff solicitude, I have considered his deposition testimony, (ECF No. 142-19 ("P's Depo.")), his Third Amended Complaint, which was sworn under penalty of perjury pursuant to 28 U.S.C. § 1746, (ECF No. 68 ("TAC")), his opposition papers, (ECF Nos. 160-61), and his February 28, 2022 letter, (ECF No. 168).  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.") (cleaned up).

call, she further told the operator that the man had "groped" her, attempted to rob them, and grabbed her buttocks.  (ECF No. 142-4 Ex. D; ECF No. 142-8 at 3; South Nyack Ds' 56.1 ¶ 2.) In a supporting deposition she later prepared, Hesington stated that the suspect "leaned in and kissed me and grabbed my 'backside.'"  (ECF No. 142-8 at 3.)  She also stated that he "started saying odd things like 'I'm from World War III.  I own this place.'" (ECF No. 142-8 at 3.)

In her supporting deposition, Hesington's colleague Christine Santaite stated that she was in her office when she heard "my leasing agent Stephanie tell someone to not touch her" and saw Plaintiff attempt to kiss her.  (ECF No. 163-7 at 1.)  Santaite further stated:

> I told him to leave and he refused.  He was saying that he owned the building and he wasn't leaving.  I had Stephanie leave bldg. to call 911.  He then sat in a chair in the room and began to smoke.  I again asked him to leave and he got very mad and charged me – started yelling about being in the war and then told me to give him my jewelry and phone.  I then ran out of the building and continued to yell to call 911.  Simcha [Ungar] from our property came in to remove [illegible] and he then grabbed Simcha on his shoulder.  He also put his hand in his pocket and we ran out fearing that he had a gun – police then arrived and took over.

(*Id.*)  Ungar testified in his supporting deposition that

> Christine + Stephanie called me for help to escourt [*sic*] a man from the clubhouse.  I came back in and saw the guy smoking.  Christine told him he entered private property and needs to leave.  He refuses to leave.  He went to the kitchen; then to management's office.  He put his hand on my shoulder.  I told him do not touch me.  He said his name is WWIII.  He said he called the guys across the street.

(ECF No. 142-9 at 2.)

In his deposition, Plaintiff does not dispute that he entered the Pavion, (P's Depo. at 23:19-24:2) – where he is neither a resident nor an employee, (*see id.*) – walked into an office, (*id.* at 32:2-5), searched through a pocketbook, (*id.* at 34:12-15), stole credit cards from the pocketbook, (*id.* at 41:16-25), took money out of the office, (*id.* at 174:16-20), and told the employees he was from World War III, (*id.* at 62:10-17).  Plaintiff does dispute that he groped Hesington.  In his deposition, Plaintiff claimed that, before the police arrived, Hesington came up

to him with open arms and their faces touched as he gave her a brief "baby hug," (*id.* at 39:2-13, 142:5-13), but he did not touch her buttocks, (*id.* at 39:10-13). Instead, Plaintiff claims that after his interaction with Hesington, Santaite came out of the office and told him that there were no apartments available for rent because he was not Jewish and the apartment complex was exclusively for people of Jewish descent. (*Id.* at 144:20-145:23.)

Defendants Warren and Murray were the first officers to arrive at Pavion after receiving a dispatch call describing a "report of an irate male." (ECF No. 142-4 Ex. D1; *see* ECF No. 142-3 Ex. C ("Video 1") at 0:40-1:05; ECF No. 163-3 ("Warren Aff.") ¶¶ 10-11; ECF No. 163-4 ("Murray Aff.") ¶¶ 10-11.) Warren, arriving first, was met by three people (presumably Hesington, Santaite, and Ungar) who told him that Plaintiff was "acting inappropriately, touching an employee in an unwanted manner, potentially committing a burglary, and refusing to leave." (ECF No. 164 ("Orangetown Ds' 56.1") ¶ 9). Warren then went into the offices where he encountered Plaintiff, who Warren alleges he had met before and seen "become violent with other police officers." (Warren Aff. ¶¶ 12-13.) Warren spoke with Plaintiff in a calm manner so as not to excite him and informed him that he was a suspect in alleged forceful touching and burglary. (Orangetown Ds' 56.1 ¶¶ 16-17.) Plaintiff attempted to walk past Warren, (Warren Aff. ¶ 16), and Warren took out his handcuffs, whereupon Plaintiff struck Warren in the face with his left hand, (*id.* ¶¶ 17-18).

In his deposition testimony, Plaintiff denies attacking Warren, claiming instead that Warren grabbed his arm but Plaintiff did not retaliate. (P's Depo. at 44:3-10.) The video footage provided by Defendants, however, confirms Warren's account of events.[2] Although neither

---

[2] Both sets of Defendants produced the same five video clips from the incident. (ECF No. 142-3 (Exs. C, C1, C2, C3, C4); ECF No. 163-19 to 163-23 (Exs. S, T, U, V, W).) The

Plaintiff nor Warren is completely visible at the onset of the video – as they are standing in the doorway and the camera is positioned right above the door – the footage clearly shows that Warren and Plaintiff had a discussion and then Plaintiff stepped outside of the camera's view.

---

videos did not capture the audio from the incident, but because the clips are screen recordings made after the incident, the audio that appears on the exhibits includes conversations from when the screen recordings were retrieved.

On March 3, 2022, Plaintiff wrote to the Court regarding the authenticity of Exhibit S to the Svensson Declaration. (ECF No. 170.)  Plaintiff argued that the video "has been altered" because "[a]t 37 seconds you see at the bottom of the screen a green line which is a mechanism to edit videos" and "at 41 seconds you see me standing and then I disappear and move to another position and spot by 42 seconds." (*Id.* at 1.)  Officers Warren, Murray, and Casey confirmed in their affidavits that the videotapes attached as Exhibits S-W to the Svensson Declaration are fair and accurate depictions of what happened on February 20, 2020, (Warren Aff. ¶¶ 7-8; Murray Aff. ¶¶ 7-8; ECF No. 163-5 ("Casey Aff.") ¶¶ 7-8); and Officers Van Cura and Esposito confirmed in their affidavits that Exhibit C to the Dorfman Declaration "fairly and accurately depicts the February 20, 2020 incident with plaintiff," (ECF No. 143 ("Van Cura Aff.") ¶ 14; ECF No. 144 ("Esposito Aff.") ¶ 15).  Upon my review of the video, it is clear that the line appearing at the bottom of the video marked as Exhibit S is a function of the playback software rather than an editing tool and simply shows the timing of the video.  Further, the video appears to glitch as a result of a lag in the playback, a common problem with surveillance videos.  There is no evidence supporting the notion that Defendants purposely altered the video or that it has been manipulated at all.  Further, the allegedly doctored section shows only Plaintiff roaming around in the lobby of the apartment building.  It does not depict any of the conduct at issue – other videos show Plaintiff rifling a desk and purse, and the encounter with the officers, all of which took place in the building's offices – and therefore is not relevant to my analysis of Plaintiff's claims of excessive force, failure to intervene, unreasonable seizure, or assault and battery.  Indeed, Plaintiff himself relies on the videos throughout various points of his deposition when advantageous to his position, (P's Depo. at 76:23-77:13, 136:10-16, 138:10-139:9, 150:17-151:3, 237:18-23), and testifies that the videos "have some accuracy," (*id.* at 53:17-23).  Because I do not find that Plaintiff has submitted any evidence that the videos have been altered or doctored, I will consider them as evidence for purposes of summary judgment.  *Wiles v. City of N.Y.*, No. 13-CV-2898, 2016 WL 6238609, at *3 (S.D.N.Y. Oct. 25, 2016) ("When the parties disagree as to the existence of a genuine dispute of a material fact, the Court may consult incontrovertible video evidence to determine whether summary judgment is nevertheless appropriate.") (citing *Scott v. Harris*, 550 U.S. 372, 379-80 (2007)); *see Walker v. Raja*, No. 17-CV-5202, 2020 WL 606788, at *3 n.6 (E.D.N.Y. Feb. 7, 2020) (considering video evidence where *pro se* plaintiff challenged the authenticity of the video but "offer[ed] no record evidence to suggest that the video evidence was doctored"); *Heicklen v. Toala*, No. 08-CV-2457, 2010 WL 565426, at *2 (S.D.N.Y. Feb. 18, 2010) ("A court may determine that there is no genuine dispute as to certain facts when one party's version of the facts is blatantly contradicted by video evidence.") (cleaned up), *aff'd sub nom. Heicklen v. Kelly*, 409 F. App'x 457 (2d Cir. 2011).

(Video 1 at 1:10-1:16.)  Warren took his handcuffs from his belt, a few seconds passed, Plaintiff

shoved Warren into the door and appeared to slug him, and a fistfight ensued, with the parties

struggling with one another until they were both on the ground.  (*Id.* at 1:13-1:24.)[3]

As Warren struggled to detain Plaintiff, Defendant Murray entered the office and

attempted to assist Warren by getting Plaintiff to lay on the floor on his stomach and by holding

Plaintiff's legs down as Warren struck his upper body with a closed fist.  (*Id.* at 1:26-1:37).

Warren commanded Plaintiff to stop resisting arrest.  (Warren Aff. ¶ 22.)  The video footage

depicts that Plaintiff continued to resist arrest by attempting to get off the floor, including by

bending his knees, moving his legs, and trying to use his upper body to push himself up.  (Video

1 at 1:26-2:00.)  Ungar and another individual identified as Chaim Stekel then entered the office

and appear to attempt to assist the officers in subduing Plaintiff by holding down him down with

their feet.  (Video 1 at 1:35-2:00; TAC ¶ 21.)  Plaintiff continued to struggle, and Warren next

deployed his taser, "which include[d] the ejection of two prongs towards [Plaintiff's] legs," but

Warren could not tell where the taser deployed.  (Warren Aff. ¶ 23.)  Warren observed that the

Taser did not have any effect on Plaintiff.  (*Id.* ¶ 24).  The video likewise shows no effect of the

Taser, as Plaintiff continued to move on the floor and attempt to lift himself up.  (Video 1 at

2:00-2:16.)  Plaintiff then started tugging on Warren's firearm and bit his hand.[4]  (Warren Aff. ¶¶

---

[3] Plaintiff claimed at his deposition that this video has been edited, (P's Depo. at 44:3-10), but as discussed in footnote 2 above with respect to a different video, he provides no evidence that this is the case.  Moreover, he does not specify what portions of the video are incorrect.  To the contrary, in his opposition he asks the Court to rely on its accuracy.  (*See* ECF No. 160 ("P's Opp. 1") at 2-3, 23.)

[4] Defendant Warren was later transported to Nyack Hospital for treatment of a laceration, facial bruising, and a high ankle sprain.  (Warren Aff. ¶¶ 43-47.)  Defendant Murray also required treatment at Nyack Hospital, including a four-month rehabilitation for a disc injury before he could return to work.  (Murray Aff. ¶¶ 24-25.)

24, 27-28; ECF No. 163-11.)  Defendant Murray heard Warren state that Plaintiff was "going for my gun."  (Murray Aff. ¶ 15.)  Plaintiff in his deposition denies taking the gun but never disputes trying to do so.  (P's Depo. at 187:11-188:2.)  After this, Warren "delivered a series of strikes in attempt to subdue" Plaintiff and prevent him from grabbing the Taser, which was within reach. (Warren Aff. ¶ 29.)

Warren next radioed for back up and told the dispatcher that his Taser had been deployed but with little to no effect.  (ECF No. 142-4 Ex. D; *see* Video 1 at 2:28-2:39.)  The two officers and two civilians then continued to try to hold Plaintiff down, and Murray delivered several punches as Plaintiff continued to resist arrest.  (Video 1 at 2:40-3:10.)  Warren then moved toward Plaintiff's head and appears to grab Plaintiff's left arm in an attempt to place the cuffs on him as Plaintiff is resisting.  (*Id.* at 3:10-3:38.)

Shortly thereafter, Defendants Whalen and Esposito arrived on scene.  (*Id.* at 3:54.) When Whalen entered the room, he grabbed Plaintiff's arms and wrists and delivered a foot strike to Plaintiff's buttocks area, (Orangetown Ds' 56.1 ¶ 33; Video 1 at 3:55-4:23), while Plaintiff continued to ignore verbal directives to stop resisting, (Warren Aff. ¶ 33; Esposito Aff. ¶ 6).  Next, Esposito entered the room where he observed Plaintiff "yelling, screaming, actively resisting arrest by clenching, flailing, and twisting his body, and refusing the OPD officers' directions to stop resisting and place his hands behind his back."  (Esposito Aff. ¶ 7.)  Esposito then deployed his Taser upon instruction from one of the Orangetown police officers, although he does not say who.  (*Id.* ¶ 10.)  Esposito deployed the Taser "one time utilizing a drive stun technique by placing the taser on plaintiff's back, where it deployed two darts, and then placing it on the plaintiff's upper thigh in order to increase the effectiveness of the deployment of the taser."  (*Id.* ¶ 11.)  But the Taser was ineffective, and Plaintiff continued to resist arrest and state

that he was "God."  (*Id.* ¶ 12; *see* Warren Aff. ¶ 33.)  After Esposito deployed the Taser,

Defendant Van Cura entered the room. (Video 1 at 5:01.)  On the video footage, Van Cura can

be seen standing by and assisting by moving the desk furniture out of the way, but he does not

touch Plaintiff.  (*Id.* at 5:01-7:42; Van Cura Aff. ¶¶ 5-13.)

   Plaintiff continued to resist arrest for the next several minutes, including by moving

underneath the desk in the office and lifting the desk up with a part of his body.  (*See* Video 1 at

5:01-5:30.)  Finally, after a total of approximately five and half minutes of struggle between the

officers and Plaintiff, Plaintiff was handcuffed and appeared to stop resisting.  (*Id.* at 7:00.)

Although Plaintiff's deposition testimony is inconsistent as to his resistance, and he claims lack

of memory to a remarkable degree, he did admit that there was a "struggle of some kind" prior to

him getting handcuffed.  (P's Depo. at 48:10-16.)

   Following his arrest, officers conducted a search of Plaintiff's pockets and seized various

items, including $56 in cash, credit cards belonging to Santaite, and a substance believed to be

crack cocaine.  (ECF No. 163-13; ECF No. 163-24; ECF No. 163-25; ECF No. 163-26;

Orangetown Ds' 56.1 ¶¶ 42, 44.)  Although Defendant Casey alleges that did not participate in

the search of Plaintiff at the scene, (Casey Aff. ¶ 11; *see* ECF No. 163-23), Plaintiff states in his

opposition that Casey pulled his pants down and searched him after his arrest, (ECF No. 161

("P's Opp. 2") at 1).  In support of this argument, Plaintiff references the video footage taken in

the Pavion office after his arrest, in which three officers, who have not been identified for the

Court, pulled up Plaintiff's shorts, searched his pockets, pulled out the contents, and placed them

on the white table next to them.  (*Id.* at 2; *see* ECF No. 163-23.)  Plaintiff claims that the video

"mysteriously" omits footage of the officers laying the money out on the white table, (P's Opp. 2

at 2), as photographed in Exhibit Y to the Svensson Declaration, (ECF No. 163-25).  Plaintiff

further disputes the amount of money found in his pockets, claiming he had $800, not $56,[5] and asserts that it all belonged to him and was allegedly given to Santaite wrongfully.  (TAC ¶¶ 23, 49.)  Santaite stated in her supporting deposition that after she returned to her office, she noticed Plaintiff had gone through her desk and purse, and that all of her cash and several of her credit cards were missing; but she was informed that the officers recovered all of her property from Plaintiff upon his arrest.  (ECF No. 163-7 at 2; *see* ECF No. 142-3 Ex. C4.)

After the search was conducted, Plaintiff walked outside to a police car under his own power.  (ECF No. 142-3 Ex. C1 at 1:52-2:10; *id.* Ex. C2 at 0:39-1:00; P's Depo. at 48:4-9.)  Murray then transported Plaintiff to Nyack Hospital, (Murray Aff. ¶ 22), where he was treated by Dr. Samar Sharma, (ECF No. 142-18).  The medical documentation from February 20, 2020 indicates that Plaintiff initially refused removal of the taser barbs but then agreed, and Dr. Sharma removed the barbs and irrigated the wound.[6]  (ECF No. 142-18 at 9.)  Dr. Sharma ultimately diagnosed Plaintiff with acute psychosis and a minor head injury.  (*Id.*)

Defendant Casey later transported Plaintiff from the hospital to the OPD, (Casey Aff. ¶¶ 16-17), where, during processing, Casey found $25 belonging to Plaintiff, (Orangetown Ds' 56.1 ¶ 46), which Plaintiff disputes, (P's Opp. 2 at 2).  Plaintiff alleges that when he arrived at the OPD, he realized his "right knee, back & neck hurt a whole lot."  (TAC ¶ 27.)  Plaintiff also alleges that the altercation with the police "made me antisocial & paranoid & I accepted mental health treatment," including "taking medication for pain, depression/PTSD."  (*Id.*)  Plaintiff

---

[5] Plaintiff claims in his opposition that he had "several hundred dollars."  (P's Opp. at 2.)

[6] Plaintiff alleges that Dr. Sharma only removed one of the two Taser darts from his back, (TAC ¶ 26), but the medical documentation confirms that both darts were removed, (ECF No. 142-18 at 9), and Plaintiff received multiple x-rays that confirmed that no foreign body remained in his back, (ECF No. 142-18 at 2, 8).

claims that he "sustained taser wounds on his body, permanent burn marks, scars, sore spots, also one puss filled area where a taser dart struck and entered the plaintiff," (*id.* ¶ 29), as well as "broken skin and bleeding, abrasions on his face, eye lid, busted lips, blood clots on head," (*id.* ¶ 31).  He alleges that he now experiences "headaches, hot flashes, and nerve issues," (*id.* ¶ 32), and suffers from knee, elbow, lower back, and neck pain, (*id.* ¶ 33).

On February 26, 2020, Plaintiff was indicted on charges of Burglary in the Second Degree, Robbery in the Second Degree, Attempted Criminal Possession of a Weapon in the Second Degree, two counts of Assault in the Second Degree, six counts of Grand Larceny in the Fourth Degree, Forcible Touching, Obstructing Governmental Administration in the Second Degree, and Resisting Arrest.  (ECF No. 142-13.)  Plaintiff ultimately pled guilty to Burglary in the Third Degree and Assault in the Second Degree.  (ECF No. 142-17 at 3.)

**B.**    **Procedural History**

Plaintiff filed his original Complaint on July 22, 2020 against "Orangetown Police Officers John Does."  (ECF No. 1.)  On September 29, 2020, Plaintiff informed the Court that he knew the identity of the John Doe officers and obtained leave to amend the complaint to name them.  (ECF Nos. 4, 7.)  On October 15, 2020, Plaintiff filed his amended complaint, naming PO Michael Warren, PO Thomas Murray, PO A. Esposito, PO P. Van Cura, OPD, South Nyack-Grandview PD, Pavion, Simcha Ungar, Chaim M. Stekel, Christine Santaite, and Louis Falco III as defendants.  (ECF No. 12.)

On December 1, 2020, I issued a *Valentin* order, (ECF No. 18), which resulted in the identification of Sergeant Whalen, (ECF No. 20), who Plaintiff named as an additional defendant in the Second Amended Complaint ("SAC") filed on December 9, 2020, (ECF No. 21).  On December 10, 2020, I dismissed the claims against the OPD and South Nyack-Grand View PD,

10

(ECF No. 22), and denied Plaintiff's motion for reconsideration as to this dismissal on December 23, 2020, (ECF Nos. 25-26).  On January 14, 2021, Plaintiff indicated that he wanted to withdraw all claims against Defendant Falco, (Minute Entry dated Jan. 14, 2021), and I entered an order of dismissal as to him, (ECF No. 44).

On February 18, 2021, during a status conference, I granted Plaintiff leave to amend the complaint to add Defendant PO Patrick Casey.  (Minute Entry dated Feb. 18, 2021.)  The operative complaint, the TAC, was filed on February 22, 2021.[7]  (TAC.)  On September 9, 2021, Plaintiff informed the Court that he no longer sought to pursue his claims against Pavion and Santaite, (ECF No. 114), and on September 30, 2021, Plaintiff also informed the Court of his intention to withdraw Ungar and Stekel as defendants, (ECF No. 119).  I granted both requests. (ECF Nos. 115, 120.)

On November 15, 2021, at a status conference, I granted Defendants' requests to file summary judgment motions.[8]  (Minute Entry dated Nov. 15, 2021.)  On January 28, 2022, the South Nyack Defendants filed their motion, (ECF No. 141), and on February 15, 2022, the Orangetown Defendants filed theirs, (ECF No. 162).  Plaintiff filed his opposition to both motions on February 14, 2022.[9]  Only the Orangetown Defendants submitted a reply.  (ECF No. 167.)

---

[7] The TAC inadvertently listed the OPD, South Nyack-Grand View PD, and Falco as defendants, as the first few pages of the TAC appear to be copies of the SAC, but these parties remain dismissed.

[8] I set a schedule for Plaintiff to file a cross-motion but no cross-motion was ever filed.

[9] The Orangetown Defendants originally filed their motion on January 28, 2022, (ECF Nos. 150-51), but due to a filing error, they had to refile on February 15, 2022, which is why it appears on the docket as if Plaintiff responded to the motion before its technical filing date.  ECF No. 160 contains Plaintiff's opposition to both the Orangetown Defendants' and South Nyack Defendants' motions; ECF pages 1-19 respond to the South Nyack Defendants' motion and ECF

## II.   LEGAL STANDARD

### A.   Motion for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

---

pages 20-30 respond to the Orangetown Defendants' motion.  ECF No. 161 contains Plaintiff's additional response to the Orangetown Defendants' motion.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

**B.**     *Pro se* **Plaintiffs**

Submissions by *pro se* plaintiffs are to be examined with "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010), interpreted "to raise the strongest arguments that they suggest," *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*) (cleaned up), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).  "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff."  *Adams v. George*, No. 18-CV-2630, 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8,

2020).[10] *Pro se* status "does not, however, excuse a *pro se* litigant from making the showing

required to defeat summary judgment; he or she must offer more than 'bald assertions,

completely unsupported by evidence' to overcome the motion." *Keesh v. Quick*, No. 19-CV-

8942, 2022 WL 2160127, at *4 (S.D.N.Y. June 15, 2022) (quoting *Wisdom v. Loiodice*, No. 17-

CV-04837, 2020 WL 4431590, at *4 (S.D.N.Y. July 31, 2020)).

## C.   <u>Qualified Immunity</u>

Government officials exercising discretionary functions are entitled to qualified

immunity shielding them from damages in a § 1983 suit "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), or insofar as it was objectively

reasonable for them to believe that their conduct did not violate such rights. *See Anderson v.*

*Creighton*, 483 U.S. 635, 638-39 (1987).

> A government official sued in his individual capacity is entitled to qualified
> immunity (1) if the conduct attributed to him was not prohibited by federal law; or
> (2) where that conduct was so prohibited, if the plaintiff's right not to be
> subjected to such conduct by the defendant was not clearly established at the time
> it occurred; or (3) if the defendant's action was objectively legally reasonable in
> light of the legal rules that were clearly established at the time it was taken.

*Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (cleaned up); *see Creighton*,

483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally

liable for an allegedly unlawful official action generally turns on the objective legal

reasonableness of the action, assessed in light of the legal rules that were clearly established at

the time it was taken.") (cleaned up).

---

[10] The Court will send to Plaintiff copies of all unpublished decisions cited in this
Opinion and Order.

While there need not be "a case directly on point" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (cleaned up). Thus, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and summary judgment should be granted on the basis of a qualified immunity defense unless all reasonably competent officers would agree that the conduct at issue violates the Constitution, *id*.

"Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (cleaned up). "Qualified immunity protects actions in the hazy border between excessive and acceptable force." *Mullenix v. Luna*, 577 U.S. 7, 18 (2015) (cleaned up). Unless the use of excessive force is obvious, to show a violation of clearly established law, a plaintiff "must identify a case that put [the officer] on notice that his specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021).

## III.   DISCUSSION

### A.   Constitutional Claims

#### 1.   Excessive Force

Plaintiff claims that Defendants Warren, Murray, Esposito, and Whalen used excessive force against him during his arrest in violation of the Fourth Amendment. (TAC ¶¶ 17-19, 28.)

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy*, 623 F.3d at 96.

> A claim that excessive force was used in the course of a seizure is subject to an objective test of reasonableness under the totality of the circumstances, which requires consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest.

*Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000).  Once the court has determined the relevant undisputed facts and drawn all inferences in favor of the nonmoving party, the court's determination of reasonableness at the summary judgment stage is a pure question of law, and must be made from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).  The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.

It is clearly established that gratuitously using force against a compliant individual is impermissible, *see Jones v. Treubig*, 963 F.3d 214, 226 (2d Cir. 2020); *Tracy*, 623 F.3d at 98, but the same is not true if the individual is resisting arrest, refusing to be handcuffed, or attacking the officers, *see Jones*, 963 F.3d at 228; *Penree by Penree v. City of Utica*, 694 F. App'x 30, 33 (2d Cir. 2017) (summary order); *MacLeod v. Town of Brattleboro*, 548 F. App'x 6, 8 (2d Cir. 2013) (summary order).  On the undisputed facts here, the officers are entitled to qualified immunity on the excessive force claims.

a.     Use of the Tasers

Plaintiff alleges that Defendants Warren and Esposito used excessive force when tasing him during the course of his arrest. (TAC ¶¶ 18-19.)  Plaintiff argues that Warren's use of force was excessive because he was "laying on the ground facedown getting brutal[ized] by massive punches and tased an abundant amount of times."  (P's Opp. 1 at 21.)  Plaintiff argues that Esposito's use of force was excessive because he was "laying facedown on the ground with several officers on top of him, when Officer Esposito [took] a taser, and tase[d] the plaintiff in the back twice for very lengthy periods."  (*Id.* at 2.)  He adds that the Taser was fired in close range and has resulted in several injuries and pain, suffering, and ongoing medical attention.  (*Id.* at 3.)  Plaintiff can maintain this position only by ignoring the undisputed facts that he attacked Warren, got into a fistfight with him, refused to be handcuffed, ignored repeated commands to stop resisting, and continued struggling against several officers.

The use of a Taser constitutes significant force.  *Jones*, 963 F.3d at 226.  The Second Circuit's "precedents suggest that it is *not* excessive force to deploy tasers, after a warning, against arrestees who are dangerous or resisting arrest."  *Penree*, 694 F. App'x at 33 (emphasis in original); *see MacLeod*, 548 F. App'x at 8 (concluding that the use of a Taser "to subdue an actively non-compliant suspect . . . who posed a real and imminent threat to the safety of the officers and any bystanders" was objectively reasonable where the officers gave "repeated, clear commands that [the plaintiff] return to the ground").  But Plaintiff has pointed to no Circuit or Supreme Court precedent requiring a warning, and the Court has found none.  While other Circuits have held that "[f]ailure to warn before the . . . use of taser can constitute excessive force depending on the circumstances," *Whitfield v. City of Newburgh*, No. 08-CV-8516, 2015 WL 9275695, at *16 (S.D.N.Y. Dec. 17, 2015) (citing cases from Fourth, Seventh, Ninth, and

Tenth Circuits), cases within this Circuit have acknowledged that when a conflict "evolve[s] unexpectedly and rapidly," a warning is not feasible, *Ramos v. Town of E. Hartford*, No. 16-CV-166, 2019 WL 2785594, at \*10 (D. Conn. July 2, 2019).  Thus, where a plaintiff precipitates an unexpected physical altercation and is resisting arrest and fighting the officers, a warning is likely not feasible, but even if it were, in the absence of clearly established law requiring a warning, an officer's failure to warn before deploying the Taser does not deprive him of qualified immunity for the otherwise reasonable use of a Taser against an actively noncompliant suspect.

Courts in this Circuit have further distinguished between the use of Tasers in dart mode and stun mode.  When a Taser is used in dart mode, "two metal darts" are "fired" and "imbed[ded] in" a person's "skin or clothing."  *Garcia v. Dutchess County*, 43 F. Supp. 3d 281, 287 n.6 (S.D.N.Y. 2014), *aff'd in part, dismissed in part sub nom. Garcia v. Sistarenik*, 603 F. App'x 61 (2d Cir. 2015).  "The target of a taser deployed in dart mode experiences a painful electric shock that 'instantly overrides the . . . central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless," and causing "excruciating pain that radiates throughout the body.'"  *Negron v. City of N.Y.*, 976 F. Supp. 2d 360, 367 (E.D.N.Y. 2013) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010)).  "When a taser is used in stun mode, an electrical current is sent to the muscles in the area against which the weapon is pressed."  *Garcia*, 43 F. Supp. 3d at 290-91.  Accordingly, Courts have found that using the Taser in "drive-stun mode is a 'less-intense' option."  *Hamell v. City of Utica*, No. 16-CV-991, 2019 WL 1933938, at \*15 (N.D.N.Y. May 1, 2019); *see Crowell v. Kirkpatrick*, 400 F. App'x 592, 595 (2d Cir. 2010) (summary order) ("Defendants set the taser on 'drive stun' mode, which typically causes temporary, if significant, pain and no permanent injury" and "[g]iven the totality

of those circumstances, it is difficult to see how a rational factfinder could conclude that the officers' actions were anything other than reasonable.").

And even if an officer's initial use of a Taser is reasonable, the Court must also consider whether the duration of the taser use was reasonable. *Ramos*, 2019 WL 2785594, at *10. The reasonableness of the duration inquiry turns on whether the suspect was subdued and no longer a threat to Defendants. *Id.*

I will first analyze Warren's use of the Taser. The video footage depicts that Plaintiff lunged at and struck Warren when he attempted to arrest Plaintiff, (Video 1 at 1:13-1:24), and as a result, Warren and Murray wrestled him to the ground with what appears to be significant difficulty, (*id.* at 1:26-1:37). Plaintiff does not dispute that the officers instructed him to stop resisting throughout the struggle. (*See* P's Depo. at 48:23-49:11; *see also* Warren Aff. ¶ 22.) And the video footage depicts that Plaintiff continued to resist arrest prior to being tased by attempting to get off the floor, including by bending his knees, moving his legs, and trying to use his upper body to push himself up. (Video 1 at 1:26-2:00.) The record does not indicate that Warren ever issued an explicit warning to Plaintiff prior to using the Taser. The Orangetown Defendants allege that Warren deployed his Taser in dart mode, resulting in "the ejection of two prongs towards [Plaintiff's] legs in an effort to stop his violent struggle but [Warren] could not tell where the taser deployed" and "did not notice any effect on [Plaintiff]'s behavior from the deployment of the taser." (Orangetown Ds' 56.1 ¶ 25; Warren Aff. ¶¶ 23-24.) In contrast, Plaintiff argues that Warren tased him "an abundant amount of times," (P's Opp. 1 at 21), and tased him in the head, (TAC ¶ 18; P's Depo. at 58:12-21).

As to Plaintiff's first claim that the Taser was deployed many times, the Orangetown Defendants provided a Taser report that suggests the Taser was triggered five times in quick

succession for a total of 20 seconds, (ECF No. 163-14), and the video shows the deployment, after which the Taser is seen on the ground as the struggle continues. (Video 1 at 2:00-2:45). Warren did not see it successfully deploy and saw no reaction from Plaintiff.  (Warren Aff. ¶ 24.) Plaintiff points to no physical or medical evidence that the two darts from Warren's Taser successfully embedded in his body or caused the electric shock; rather, he complains of the darts from the later tasing were stuck in his back.  It thus does not appear that this deployment of the Taser successfully completed the circuit necessary for the electric charge.  In any event, the video shows that whatever happened with the Taser, it did not derail Plaintiff from struggling against the officers.

As to Plaintiff's second claim that he was tased in the head, this assertion is belied by the record.  Plaintiff submitted color pictures of his head injuries, none of which show that Warren deployed his Taser in dart mode in Plaintiff's head.  (ECF No. 168 at 2-5.)  Plaintiff does not dispute that Warren used his Taser in dart mode and, as explained above, a Taser deployed in dart mode shoots two metal darts and imbeds them in a person's skin.  Surely if Warren had shot Plaintiff's head with darts, there would be visible incision marks in the photos taken after the incident in the hospital.  *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 555 (2d Cir. 2005) (Summary judgment is appropriate where "no reasonable juror would undertake the suspension of disbelief necessary to give credit to the allegations made in [the] complaint.").

At the least, all reasonably competent objective officers would not agree that Warren's deployment of the Taser was unreasonable, based on the video footage.  During the entire time leading up to deployment of the Taser, Plaintiff is resisting arrest and clearly posing a threat to the officers and the employees at Pavion.  (Video 1 at 1:20-2:24.)  Application of physical force did not succeed in gaining Plaintiff's compliance.  *See Ramos*, 2019 WL 2785594, at *10 (use of

Taser reasonable when plaintiff continued to fight back despite officers pushing and punching him).  Plaintiff can be seen moving his legs, kicking his feet, and attempting to get off the floor up until, and after, Warren radios the OPD dispatcher that his Taser had been employed but with little to no effect.  (*See* Video 1 at 2:28-2:39; ECF No. 142-4 Ex. D2.)  The duration of the charge was justified, or at least reasonable officers would not all agree it was unjustified, given its apparent ineffectiveness in getting Plaintiff to comply.  The failure to warn Plaintiff about deployment of the Taser does not preclude qualified immunity because it is not clearly established that a warning is required in these circumstances, and in any event the fight "evolved unexpectedly and rapidly," such that "a warning was not feasible."  *Ramos*, 2019 WL 2785594, at *10.  In the moment preceding Warren's deployment of the Taser, he is clearly struggling to subdue Plaintiff, and when he radios the OPD, he is breathless and speaking quickly, demonstrating the intensity of the altercation with Plaintiff.  (ECF No. 142-4 Ex. D2.) Moreover, Plaintiff had been acting in an irate fashion that prompted the Pavion employees to call 911, and then clearly posed an immediate threat to the safety of the officers and employees as he had recently assaulted the employees and had just attacked Warren when being detained. A reasonable officer could regard the use of the Taser in that situation as appropriate, and therefore Warren is entitled to qualified immunity.

  I will next analyze Esposito's use of his Taser.  The report for Esposito's Taser provided by Plaintiff indicates that Esposito triggered the Taser twice, once at 16:52:02 for 15 seconds and again at 16:52:17 for 5 seconds, resulting in an almost continuous 20-second tasing.  (P's Opp. 1 at 9.)  As is reflected in the video, Esposito is the fourth officer to enter the office.  (Video 1 at 3:55.)  Esposito observed that Plaintiff was "actively resisting arrest by clenching, flailing, and twisting his body, and refusing the OPD officers' directions to stop resisting and place his hands

behind his back." (Esposito Aff. ¶ 7; Video 1 at 3:55-4:40; *see* Warren Aff. ¶ 33.) Esposito

directed Plaintiff to put his hands behind his back but he continued to physically struggle.

(Esposito Aff. ¶¶ 8-9.) One of the other officers instructed Esposito to deploy his Taser, (*id.* ¶

10); Esposito pulled his Taser out, (Video 1 at 4:40); and Esposito "plac[ed] the taser on

plaintiff's back, where it deployed two darts, and then plac[ed] it on the plaintiff's upper thigh in

order to increase the effectiveness of the deployment of the taser," (Esposito Aff. ¶ 11).[11]

      For many of the same reasons stated above, Esposito is at least entitled to qualified

immunity for his use of force based on Plaintiff's continued resistance to arrest. As with Warren,

Plaintiff did not stop struggling despite the duration of the charge. Plaintiff clearly posed a threat

to the officers and the Pavion employees and refused to comply with commands to stop

resisting.[12]

      Accordingly, given the totality of the circumstances, Defendants Warren and Esposito are

entitled to qualified immunity for the deployment of their Tasers in the manner they did. *See*

*Brown v. City of N.Y.*, 862 F.3d 182, 190 (2d Cir. 2017) (repeated use of pepper spray, kicking of

plaintiff's legs out from under her to bring her to the ground, and pushing her face onto

pavement protected by qualified immunity where plaintiff "refused to comply with the

instructions to place her hands behind her back for handcuffing;" no precedent clearly

established that such force in those circumstances violated the Fourth Amendment). There is

---

    [11] Esposito describes the Taser deployment as a "drive stun technique," (Esposito Aff. ¶ 11), which may be so in the sense that the darts did not travel a distance before contacting the skin, but he clearly deployed the Taser in dart mode, as he acknowledges that the Taser deployed two darts into Plaintiff's back, (*id.*).

    [12] Further, although no formal warning was given, the OPD officer told Esposito to tase Plaintiff within Plaintiff's earshot, (*see* Esposito Aff. ¶¶ 9-10), so that statement served to warn Plaintiff that a tasing was coming if he did not comply.

simply no "existing precedent [that] squarely governs the specific facts at issue," *Kisela*, 138 S.

Ct. at 1153 (cleaned up); *see Rivas-Villegas*, 142 S. Ct. at 8, and thus qualified immunity protects

the officers' "actions in the hazy border between excessive and acceptable force," *Mullenix*, 577

U.S. at 18 (cleaned up).

        b.    <u>Other Types of Force</u>

Plaintiff further alleges that Defendants Warren, Murray, and Whalen used excessive

force by "beat[ing] up" Plaintiff during the course of his arrest.  Specifically, Plaintiff alleges

that Warren was "very violent and was tasing me with no regard to my life & safety while I was

laying on the ground face down, in and out of consciousness" and Plaintiff was getting "choked

& punched in the eye, head, mouth, teeth, neck, temple."  (TAC ¶ 18.)  Plaintiff alleges that

Murray "came up from behind me, put his arms around my neck in a backwards chokehold and

slammed me face down to the ground while he was on top of my back still choking me" and that

Plaintiff had "numerous strangulation marks around his neck."  (*Id.*)  Plaintiff alleges that

Defendant Whalen "assaulted the Plaintiff while he was laying face down, defenseless &

harmless" and Whalen "kicked the Plaintiff in his lower back when he was laying face down on

the ground." (*Id.* ¶ 28.)  Again, the video belies Plaintiff's claims that he was harmless or ever

unconscious, as it shows he was neither passive nor compliant, but was actively resisting during

the events at issue.

Taking these allegations in turn, no rational jury would find Warren's use of force to be

unreasonable, or at least all reasonable officers would not so find.  Although it is not apparent

from the video that any of the officers choked Plaintiff, intentionally or unintentionally, during

the course of the struggle, it is possible that they did and it is just not visible on the video.

Regardless, a reasonable officer in these circumstances could have determined that punching

Plaintiff or putting hands on his neck was reasonable because he had been accused of serious crimes, had attacked an officer and was reaching for Warren's gun, and continued to resist arrest. *See, e.g.*, *Felix v. City of N.Y.*, 408 F. Supp. 3d 304, 311 (S.D.N.Y. 2019) (finding that "a reasonable officer could have concluded that even an intentional head slam and chokehold were reasonable" where suspect was wanted for serious offenses including robbery and assault, and the suspect engaged in a physical struggle with the officers in resisting arrest); *McKenzie v. City of N.Y.*, No. 18-CV-6913, 2021 WL 3375613, at *6 (S.D.N.Y.) ("a reasonable jury could not find . . . Cross' use of force was excessive" where Cross placed the suspect in chokehold and punched him while the suspect continued to resist arrest), *report and recommendation adopted*, 2021 WL 2894164 (S.D.N.Y. July 2, 2021).

The same is true of Murray's use of force.  Despite Plaintiff's allegations, the video footage depicts that when Murray entered the office, he wrapped his arms around Plaintiff's back in an apparent attempt to get Plaintiff on the floor and put his arms behind his back to be handcuffed.  (Video 1 at 1:26-1:37.)  It is not visible from the video that Murray ever put his arms around Plaintiff's neck in a backwards chokehold.  Further, in the color photos Plaintiff submitted to the Court documenting his head injuries, there are no visible signs of strangulation at all.  (ECF No. 168 at 2-5.)  Regardless, assuming for the sake of this motion that Murray did choke and slam Plaintiff face down, a reasonable jury would not find the force excessive, or at a minimum qualified immunity applies to that use of force, for the same reasons detailed above. Here, Murray entered the office as Plaintiff was shoving and struggling with Warren, and Plaintiff continued to aggressively resist arrest.

Finally, a jury could not find Whalen's use of force to be unreasonable.  The video footage shows that when Whalen entered the room, he administered a foot strike to Plaintiff's

buttocks and then moved toward Warren who was near Plaintiff's head.  For the next few minutes, Whalen can be seen standing on the periphery where it is not apparent what he is doing with his arms but it is clear he is not striking Plaintiff.  (Video 1 at 3:55-6:20.)  Shortly thereafter, Whalen can be seen punching Plaintiff's upper body as Plaintiff continues to resist arrest.  (*Id.* at 6:25-6:45.)  This is a reasonable use of force given Plaintiff's continued resistance to arrest and the inability of the other officers to subdue him.  *See Lagasse v. City of Waterbury*, No. 09-CV-391, 2011 WL 2709749, at *8 (D. Conn. July 12, 2011) ("In order to succeed on an excessive force claim, a plaintiff must show that the officer used more force than was necessary to subdue him.") (cleaned up); *McKenzie*, 2021 WL 3375613, at *6 (finding use of excessive force to be reasonable given "the situation escalated after [the plaintiff] fled from officers and resisted arrest").

Further, all of the officers ceased using force once Plaintiff stopped resisting.  *See Pinero v. Burbran*, No. 18-CV-4698, 2021 WL 4224727, at *4 (S.D.N.Y. Sept. 16, 2021).  At the very least, reasonable officers would not agree that Warren, Murray, and Whalen used excessive force, and thus they are entitled to qualified immunity.  *See Bradley v. Bongiovanni*, No. 18-CV-6823, 2021 WL 3635206, at *8 (W.D.N.Y. Aug. 17, 2021) (officer entitled to qualified immunity for kicks, punches and baton strikes where suspect disregarded commands, actively resisted arrest and attempted to flee).

Accordingly, the Orangetown Defendants' and the South Nyack Defendants' motions for summary judgment are granted as to Plaintiff's excessive force claim.

## 2. Failure to Intervene

Plaintiff alleges that Defendant Van Cura failed to intervene when Defendant Esposito used the Taser on him during the course of his arrest.  (TAC ¶ 20.)

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (cleaned up).  "An officer who fails to intercede in . . . another constitutional violation is liable for the preventable harm caused by the actions of other officers." *Id.*  An officer can be liable under § 1983 where "[i] the officer had a realistic opportunity to intervene and prevent the harm; [ii] a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and [iii] the officer does not take reasonable steps to intervene." *Taylor v. City of N.Y.*, No. 19-CV-6754, 2022 WL 744037, at *21 (S.D.N.Y. Mar. 11, 2022) (cleaned up).

But "a failure to intervene claim is contingent only on the underlying claim." *Arbuckle v. City of N.Y.*, No. 14-CV-10248, 2016 WL 5793741, at *14 (S.D.N.Y. Sept. 30, 2016).  Because I have already granted summary judgment on the excessive force claim as to Defendant Esposito's use of the Taser, I must also grant summary judgment on the failure to intervene claim as to Defendant Van Cura.  *Pierre v. City of N.Y.*, 860 F. App'x 14, 16 (2d Cir. 2021) (summary order).  Further, Van Cura was not present when Esposito deployed the Taser, (Video 1 at 4:40-5:00), and can actually be seen outside and walking through the front doors of the building while the Taser is being deployed, (*id.*)  Thus, Plaintiff cannot plausibly allege that Van Cura had a realistic opportunity to intervene.  *Arbuckle*, 2016 WL 5793741, at *15.

Accordingly, Van Cura's motion for summary judgment is granted as to Plaintiff's failure to intervene claim.

### 3.       Unreasonable Seizure

Plaintiff alleges that Defendant Casey "went into the Plaintiff[']s pockets and stole his money, without documenting it pursuant to police procedures of New York," (TAC ¶ 23), in violation of the Fourth Amendment's protection against unreasonable seizure, (P's Opp. 1 at 24).[13]  Specifically, Plaintiff alleges that he had $800 in his pockets on the day of the incident, (TAC ¶¶ 23, 49), but after he was arrested, Casey pulled Plaintiff's pants down to search him and took this money.  (P's Opp. 2 at 1-2.)  Plaintiff claims that "[t]here was a video of the room, where this event occur[r]ed and where the money was allegedly placed on a table, yet the video evidence stops playing at a certain point and seems mysteriously to not be present to support my money in my pocket."  (*Id.* at 2.)  Plaintiff is presumably referring to Exhibit W of the Svensson Declaration, in which three officers searched Plaintiff's pockets and placed the contents of the search on the white table next to them.  (ECF No. 163-23).  Defendant Casey claims that he was not one of these three officers, stating instead that he did not participate in a search of Plaintiff at the scene.  (Casey Aff. ¶ 11.)  Further, Defendants claim that they found only $56 on Plaintiff's person during the course of the search, which they photographed and returned to Santaite.  (Orangetown Ds' 56.1 ¶¶ 42-43; ECF No. 163-25.)  It is not clear from the record whether Casey ever had the cash in his custody following the search.  Instead, Casey claims only that he transported Plaintiff from Nyack Hospital to the OPD, (Casey Aff. ¶ 17), and while Plaintiff was being processed, Casey found $25 belonging to Plaintiff, (Orangetown Ds' 56.1 ¶¶ 45-46), which Plaintiff disputes, (P's Opp. 2 at 3).  Casey recorded the $25 on Plaintiff's property sheet,

---

[13] The Orangetown Defendants interpreted Plaintiff's allegations to state a due process claim under the Fourteenth Amendment, (ECF No. 165 at 10-12), but Plaintiff made clear in his opposition that he is stating an unreasonable seizure claim under the Fourth Amendment, (P's Opp. 1 at 24).

(Orangetown Ds' 56.1 ¶ 46), but Plaintiff alleges that he only ever received 25 cents, (P's Opp. 2 at 2).

Based on the existing record, there exists questions of fact as to whether Casey was ever involved in the search at the scene of the incident (as Defendants have not identified the officers in the video of the search and the record is otherwise inconclusive) or if he ever had the cash in his custody following the search.  Regardless, "[w]here, as in this case, an initial seizure of property was reasonable, defendants' failure to return the items does not, by itself, state a separate Fourth Amendment claim of unreasonable seizure." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004); *see Bennett v. Dutchess County*, 832 F. App'x 58, 60 (2d Cir. 2020) (summary order) ("But a seizure claim based solely on the unlawful retention of property that was lawfully seized has been recognized as too novel a theory to warrant Fourth Amendment protection.") (cleaned up).  "To the extent the Constitution affords . . . any right with respect to a government agency's retention of lawfully seized property, it would appear to be procedural due process." *Ahlers v. Rabinowitz*, 684 F.3d 53, 62 (2d Cir. 2012) (cleaned up) (alteration in original).  The officers who conducted the search and seizure at the scene, incident to Plaintiff's arrest, had probable cause to seize the cash from Plaintiff's pockets, as he had just been seen by multiple witnesses and on video camera stealing credit cards and cash out of the Pavion offices.  Even assuming that Plaintiff had $800 in his pockets, which Defendants dispute, it would be reasonable for the officers to seize all of this cash in the first instance because probable cause existed to believe that it was evidence of burglary, or at least reasonable office could so conclude.  Plaintiff does not and cannot challenge the initial seizure as unlawful under the Fourth Amendment, and thus he has no Fourth Amendment claim for the alleged failure to return the funds.

The South Nyack Defendants' motion for summary judgment is granted as to Plaintiff's unreasonable seizure claim.[14]

## B. **State Law Assault and Battery Claims**

The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Having determined that the only claims over which this Court has original jurisdiction should be dismissed, and having considered the factors set forth in *Cohill*, I decline to exercise supplemental jurisdiction over the assault and battery claims.  *See id.* (citing 28 U.S.C. § 1367(c)(3)).

## IV. **CONCLUSION**

For the foregoing reasons, the Orangetown Defendants' and South Nyack Defendants' motions are GRANTED, and Plaintiff's federal claims are dismissed with prejudice.  The state claims are dismissed without prejudice.  The Clerk of the Court is respectfully directed to terminate the pending motions, (ECF Nos. 141, 162), enter judgment for Defendants, and close the case.

---

[14] Plaintiff does not pursue a procedural due process claim under the Fourteenth Amendment, but even if he had, it would fail because "a plaintiff must plead facts sufficient to give rise to a claim that he was deprived of his property without constitutionally adequate pre- or post-deprivation process." *Ahlers*, 684 F.3d at 62 (cleaned up).  "Where loss of property was random and unauthorized, courts have found that New York provides an adequate post-deprivation remedy in the form of state law causes of action for negligence, replevin, or conversion."  *Pierre v. City of N.Y.*, No. 12-CV-9462, 2014 WL 56923, at *10 (S.D.N.Y. Jan. 7, 2014) (cleaned up).  Because Plaintiff alleges a random and unauthorized deprivation or property, and has access to state law causes of action, he cannot state a claim for deprivation of property pursuant to 42 U.S.C. § 1983, and thus any due process claim would be dismissed.

**SO ORDERED.**

Dated: September 22, 2022
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.